**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

─────────────────────────────────

**PLUMBERS & PIPEFITTERS NATIONAL PENSION**
**FUND, Individually and on Behalf of All**
**Others Similarly Situated,**[1]                    **13 Cv. 5696 (JGK)**

                         **Plaintiff,**              **OPINION AND ORDER**

            **- v.-**

  **ORTHOFIX INTERNATIONAL N.V., ET AL.,**

                    **Defendants.**

─────────────────────────────────

**JOHN G. KOELTL, District Judge:**

    The plaintiff, Plumbers & Pipefitters National Pension
Fund, brought this securities class action against Orthofix
International N.V. ("Orthofix") and four of its former officers.
The plaintiff alleges that the defendants misrepresented
Orthofix's financial health to the public at various times.  The
plaintiff alleges that these misrepresentations violate Sections
10(b) and 20(a) of the Securities Exchange Act of 1934 ("the
Exchange Act"), as amended by the Private Securities Litigation
Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78j(b), 78t, 78u-4,
and Securities and Exchange Commission Rule 10b-5 promulgated
thereunder, 17 C.F.R. § 240.10b-5.  The putative class consists
of persons who purchased Orthofix common stock between March 2,
2010, and July 29, 2013.  Second Am. Compl. ("SAC") ¶ 1.

---

[1] Tejinder Singh was the named plaintiff in the original caption in this action
before the Court appointed Plumbers & Pipefitters National Pension Fund as
lead plaintiff.  The Clerk is directed to change the caption as it is
reflected in this Opinion and Order.

The defendants move to dismiss the Second Amended Complaint for failure to state a claim pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.  The defendants argue that the plaintiff has failed to allege facts supporting a strong inference of scienter, and has not alleged loss causation.

The Court has jurisdiction over the alleged Exchange Act violations pursuant to 15 U.S.C. § 78aa, and 28 U.S.C. § 1331. For the reasons explained below, the defendants' motion is **granted in part and denied in part.**

**I.**

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007).  The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient."  Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).  A complaint should not be dismissed if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

2

the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  While factual allegations should be construed in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id.

A claim under Section 10(b) of the Securities Exchange Act sounds in fraud and must meet the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and of the PSLRA, 15 U.S.C. § 78u-4(b).  Rule 9(b) requires that the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007).  The PSLRA similarly requires that the complaint "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and it adds the requirement that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); ATSI, 493 F.3d at 99.

When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced

in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken.  See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).  The Court can take judicial notice of public disclosure documents that must be filed with the Securities and Exchange Commission ("SEC") and documents that both "bear on the adequacy" of SEC disclosures and are "public disclosure documents required by law."  Kramer v. Time Warner, Inc., 937 F.2d 767, 773-74 (2d Cir. 1991); see also Silsby v. Icahn, 17 F. Supp. 3d 348, 353-54 (S.D.N.Y. 2014).

## II.

The following facts are undisputed or accepted as true for purposes of the defendants' motion to dismiss.

### A.

Orthofix is a medical device company engaging in the design, development, manufacture, and distribution of medical equipment used principally for spine and orthopedic applications.  SAC ¶ 25.  Orthofix distributes its products domestically and internationally by coordinating with doctors to sell nonsurgical devices to patients, selling devices to hospitals, or selling products by piece or in bulk to independent distributors.  SAC ¶ 3.

4

The individual defendants were all officers of Orthofix during some portion of the class period.  Defendant Alan Milinazzo served as President and Chief Executive Officer ("CEO") of Orthofix from April 2006 until July 2011.  SAC ¶ 26. Defendant Robert Vaters served as the Chief Financial Officer ("CFO") and then Chief Operating Officer ("COO") of Orthofix's Global Spine Business Unit from September 2008 to July 2011, and then served as President and CEO of Orthofix from August 2011 to March 2013.  SAC ¶ 27.  Defendant Brian McCollum served as the CFO of Orthofix from March 2011 to November 2012, and then served as President of the Global Spine Business Unit from November 2012 until July 2013.  SAC ¶ 28.  Defendant Emily Buxton served as the CFO of Orthofix's Global Orthopedics unit from July 2010 until November 2012, and then served as CFO of Orthofix from November 2012 until April 2014.  SAC ¶ 29.

According to the plaintiff, from 2010 to 2013, the individual defendants and Orthofix conducted a "scheme" to "inflate [Orthofix's] revenue and to distort the truth about its profitability."  SAC ¶ 14.  The plaintiff alleges, based on several confidential sources, that Orthofix employed various methods to recognize revenue improperly when the revenue was not yet actually received or unlikely ever to be received.  This scheme allegedly ended with Orthofix's announcement on July 29, 2013, that it would delay filing its quarterly report with the

5

SEC because "additional time [was] needed to review matters relating to revenue recognition for prior periods." SAC ¶ 14. Orthofix's July 29 press release stated that an "Audit Committee has commenced an independent review into these matters, with the assistance of outside professionals. The Audit Committee cannot predict the length of time or outcome of its review." SAC ¶ 145. Orthofix also stated that it would not be "providing annual or quarterly guidance for 2013." Id.

Immediately following the July 29 announcement, the price of Orthofix shares declined from $27.40 per share on July 29 to $22.71 per share on July 31, falling 17% on a volume of 1.3 million shares. SAC ¶ 146. On August 6, 2013, Orthofix announced that it intended to restate its financial statements for the fiscal years 2011 and 2012 and the first quarter of 2013. SAC ¶ 14.

## B.

On March 24, 2014, Orthofix restated its financial statements for the 2010, 2011, and 2012 fiscal years, and the first quarter of 2013. SAC ¶ 15. The Restatement revised Orthofix's reported net income downward for each year except 2010. SAC ¶ 16. For the 2011 fiscal year, Orthofix's net income was originally reported as a $1.1 million loss but restated as an $18.1 million loss. Id. For 2012, Orthofix's net income was originally reported as $51.3 million but restated

as $42.8 million.  Id.  Although the Restatement adjusted 2010

from $44.2 million to $44.3 million, the plaintiff alleges that

this was due to shifting income forward from the 2008 and 2009

fiscal years.  Id.

     In connection with the Restatement, Orthofix released the

results of an internal investigation triggered by concerns

raised by "senior management" and conducted by the Audit

Committee in consultation with Ernst & Young LLP.  SAC ¶ 110.

The Audit Committee concluded "that certain revenues recognized

during 2012 and 2011 should not have been recognized, or should

not have been recognized during the periods in which they were

recognized," and that therefore, Orthofix's previously released

financial statements "should no longer be relied upon."  Id.

     The background to the Restatement stated that the internal

investigation into the company's practices indicated:

> (i) the existence of extra-contractual terms or
> arrangements at the onset of the sale and concessions
> agreed to subsequent to the initial sale (such as extended
> payment terms and return and exchange rights for sales to
> distributors with respect to certain transactions),
> including some with which certain senior-level personnel
> were involved, (ii) that at the time of some sales
> collection was not reasonably assured, and (iii) that
> certain amounts previously characterized as commissions
> were paid to related parties of the applicable customer.

Id.  Accordingly, the Audit Committee concluded that Orthofix

"had material weaknesses in its internal control over financial

reporting as of December 31, 2012 related to revenue recognition

practices for sales to the Company's distributors, inventory reserves and foreign subsidiary oversight."  SAC ¶ 111.  The Audit Committee further concluded that the weaknesses in these controls "resulted in material misstatements in our previously filed annual audited and interim unaudited consolidated financial statements."  SAC ¶ 112.

Although the Restatement does not reveal the specific practices that were under investigation or the names of the "senior-level personnel" that were involved with the practices, the plaintiff relies on its confidential sources to describe the individual defendants' purported knowing or reckless personal involvement in Orthofix's improper revenue recognition.  The plaintiff alleges that Orthofix and the individual defendants encouraged several practices that led to its misstated revenue for the years 2010 to 2013.

C.

According to the plaintiff, in 2012, Orthofix engaged in what it informally termed "dope deals"—large bulk sales to distributors designed to inflate revenue before the end of a quarter.  SAC ¶¶ 41-42, 51.  These bulk sales allegedly began in late 2011 or early 2012, and each bulk sale involved multiple contracts in order to separate the terms of the sale, which would be recognized immediately, from the sale's substantial

rebates, which would not be recognized in that quarter.  SAC
¶¶ 39-40, 51.

In 2012, Orthofix made one such sale to Synergy Medical
Systems ("Synergy"), as described by two confidential sources—an
Orthofix distributor ("CW 1") and the President of Synergy ("CW
2").  According to CW 1 and CW 2, three nondefendant
representatives of Orthofix, including the CFO of Orthofix's
Global Spine unit, negotiated the bulk sale with Synergy.  SAC
¶ 39.  Orthofix presented the terms of the sale to Synergy in
two contracts—the first with the undiscounted terms of the sale,
and the second with the terms of a 15 to 20% rebate.  Id.
Orthofix ensured that the sale occurred before the end of the
quarter, and the company recognized the income from the sale in
the third quarter, but understated the related expense of the
rebate.  SAC ¶ 40.  Orthofix also allowed Synergy an extended
term to make the payment.  SAC ¶ 49.

Another confidential source, the Director of Sales for
Spinal Stimulation in Orthofix's Western region for four years
until April 2013 ("CW 3"), claimed to have been involved in many
"dope deals" starting in early 2012.  SAC ¶ 51.  According to CW
3, this program was initiated by nondefendant Bryan McMillan,
the President of Global Spine from October 2011 until October
2012, and defendant Vaters, who was CEO of Global Spine until
July 2011, when he became CEO of Orthofix.  SAC ¶¶ 27, 41, 51.

When defendant McCollum replaced McMillan as President of Global Spine, the practice continued.  SAC ¶ 51.  McMillan, Vaters, and McCollum all allegedly pressured regional distributors to execute these deals in order to meet revenue quotas by a quarter's end.  SAC ¶ 41.  The plaintiff alleges that whatever revenue was recognized at the end of each quarter due to the bulk sale deals would then "disappear" the next quarter due to the substantial rebates, whereupon employees would be directed to complete more bulk sales.  SAC ¶ 51.

### D.

Another set of the plaintiff's allegations concerns improper revenue recognition practices at Orthofix's Brazilian subsidiary, Orthofix do Brasil ("Brasil").  In early 2011, allegedly at the direction of defendant Buxton, Brasil began to recognize income for Orthofix hospital products as soon as they were used, several months before relevant authorizing documents and payment were eventually received.  SAC ¶ 72.  Furthermore, after Brasil lost a significant client in 2012, it began a more aggressive approach to increase sales to distributors.  SAC ¶¶ 73, 75.  Brasil was pressured to maintain the same level of sales before it lost the big client, but did not have many additional distributors to which it could market.  SAC ¶ 87.  According to a confidential witness, Brasil's controller from 2009 to 2012 ("CW 10"), Brasil consequently began to loosen its

10

policies around sales to distributors to encourage a high volume of sales to each distributor. SAC ¶ 76. For example, Brasil would provide extended payment plans and then not charge distributors or report them to credit monitoring services when distributors failed to make payments. Id. Thus, Brasil was able to increase its reported sales, SAC ¶¶ 76, 84, 87, but did not receive a corresponding increase in revenue. SAC ¶ 76.

Brasil informed top management internationally about these loosened terms and discounts in sales to distributors, including discounts up to 70%. SAC ¶¶ 77, 87. CW 10 sent monthly reports to an email listserv that included defendant Buxton. SAC ¶ 77. CW 10 discussed Brasil's finances directly with Brasil's financial director, who interacted with defendant Buxton regarding Brasil's finances. Id. CW 10 also attended meetings where Buxton was present and Brasil's finances were discussed. SAC ¶ 78. In 2012, CW 10 attended a meeting in Germany, with Buxton present, where some international Orthofix representatives discussed their concerns with sales to distributors. Id. Buxton allegedly told everyone at the meeting not to raise any questions discussed at that meeting at a subsequent training meeting with Ernst & Young on revenue recognition practices. Id. Despite Orthofix's United States headquarters purportedly receiving information about the

discounts and delayed payments, SAC ¶ 87, Orthofix reported the full undiscounted numbers in its financial reports.  SAC ¶ 79.

In 2012, Orthofix negotiated one particularly large sale with Grupo Implamed, a Brazilian spinal products distributor. According to Confidential Witness 11 ("CW 11"), the operations director of Grupo Implamed, on September 27, 2012, Implamed agreed to receive a $1.5 million shipment of Orthofix products on consignment.  SAC ¶ 83.  CW 11 purportedly negotiated this sale with Brian McMillan, the President of Global Spine at the time.  Id.  The products were housed in a shipping warehouse in Atlanta, Georgia, and would be sent to Implamed in Brazil if the products received regulatory approval in Brazil.  Id.  Implamed had been awaiting approval for those products for two years, and when the necessary approval never came, the products were returned to Orthofix.  Id.  Nevertheless, Orthofix allegedly recorded the sale as revenue in 2012.  SAC ¶¶ 83 n.5, 144h.

**E.**

The plaintiff also takes Orthofix to task for a "morally deficient corporate culture."  SAC ¶ 4.  In so doing, much of the Second Amended Complaint details various criminal and civil actions against Orthofix representatives.  SAC ¶¶ 4-8, 88-107. The Second Amended Complaint does not explain how any of these actions or offenses are tied to any of the specific

misstatements or omissions alleged in the Second Amended
Complaint.

**F.**

The plaintiff alleges that throughout the class period,
Orthofix and the individual defendants made misleading
statements in Orthofix's public disclosure documents filed with
the SEC.  United States Generally Accepted Accounting Principles
("GAAP") generally require that revenue not be recognized until
it is "realized" or "realizable," and until it is "earned."  SAC
¶ 122.  From 2010 through the first quarter of 2013, Orthofix
filed public disclosure reports with the SEC, including a Form
10-K for each fiscal year, and a Form 10-Q for each quarter of
each fiscal year.  SAC ¶¶ 131-140.  In the reports, Orthofix
represented that its financial statements to the SEC were
"prepared in accordance with [GAAP]."  Id.  The reports also
stated that Orthofix had conducted evaluations of "the
effectiveness of the design and operation of our disclosure
controls and procedures," and of "the effectiveness of the
Company's system of internal control over financial reporting,"
and affirmed that these controls were effective.  Id.

The reports each included a Sarbanes-Oxley Act ("SOX")
Certification affirming the truth and completeness of the
reports, and attesting to the company's internal controls over
financial reporting and disclosure systems.  SAC ¶ 131.  Each

individual defendant signed at least one SOX Certification.
Defendant Milinazzo signed Certifications for Form 10-K reports
for the 2009 and 2010 fiscal years, and for the Form 10-Q report
for the first quarter of 2011.  SAC ¶¶ 26, 131-133.  Milinazzo
resigned from his position of CEO of Orthofix in July 2011.  SAC
¶ 26.  Defendant Vaters signed Certifications for Form 10-K
reports for the 2009, 2011, and 2012 fiscal years, and for Form
10-Q reports for the second quarter of 2011 through the third
quarter of 2012.  SAC ¶¶ 27, 134-40.  On March 12, 2013,
Orthofix announced that Vaters, the CEO of Orthofix at the time,
had resigned from the company, effective immediately.  SAC
¶¶ 26, 141.

Defendant McCollum signed SOX Certifications for Form 10-K
reports for the 2010 and 2011 fiscal years, and for Form 10-Q
reports from the first quarter of 2011 through the third quarter
of 2012.  SAC ¶¶ 28, 132-39.  On June 18, 2013, Orthofix
announced that McCollum, then the President of the Global Spine
Business Unit, would resign from Orthofix in July 2013.  SAC
¶¶ 28, 143.  Finally, defendant Buxton signed Certifications for
the Form 10-K report for the 2012 fiscal year, and the Form 10-Q
report for the first quarter of 2013.  SAC ¶¶ 29, 140, 142.
Buxton resigned from the company in April 2014.  SAC ¶ 29.

According to the plaintiff, Orthofix's public disclosure
reports for the class period and the individual defendants'

corresponding affirmations were materially false and misleading when they were made because each defendant was aware that Orthofix's financial statements failed to conform to GAAP and that there were material weaknesses in the company's internal controls, as described in the Restatement issued on March 24, 2014.  Although Orthofix's public disclosure documents claimed that its financial statements were "prepared in accordance with [GAAP]" and that Orthofix's internal controls over financial reporting and disclosure procedures were effective, SAC ¶ 131, the Restatement stated that Orthofix "had material weaknesses in its internal control over financial reporting as of December 31, 2012 related to revenue recognition practices . . . [and] disclosure controls and procedures and internal control over financial reporting were not effective as of December 31, 2012." SAC ¶ 111.  The Restatement also made clear that the company's "controls were not effective to reasonably ensure accurate recognition of revenue in accordance with GAAP for certain distributor sales transactions previously recorded by the Company's domestic and international business units."  SAC ¶ 113.  Orthofix explained that the material weaknesses in its internal controls over financial reporting "resulted in material misstatements in our previously filed annual audited and interim unaudited consolidated financial statements."  SAC ¶ 112.

The plaintiff contends that the practices described in Sections II.C, II.D, and II.E of this Opinion are among those being referred to in the Restatement.  The Restatement describes an internal investigation that indicated "(i) the existence of extra-contractual terms or arrangements at the onset of the sale and concessions agreed to subsequent to the initial sale (such as extended payment terms and return and exchange rights for sales to distributors with respect to certain transactions), including some with which certain senior-level personnel were involved."  SAC ¶ 110.  The plaintiff argues that this passage includes the "dope deals," or discounted bulk sales, orchestrated by Orthofix distributors.  The plaintiff alleges that, contrary to the statements made in Orthofix's public disclosure documents at the time, the revenue from these bulk sales was not recorded in accordance with GAAP because the extra-contractual terms made Orthofix's revenues appear greater than they actually were.  SAC ¶ 127.

The Restatement also reported that the company's internal investigation found that "at the time of some sales collection was not reasonably assured."  SAC ¶ 110.  According to the plaintiff, this passage includes Orthofix do Brasil's alleged dealings with distributors, where Brasil recorded revenue from sales with extended payment periods in which it was unlikely to collect payment.  The plaintiff alleges that these practices

16

also are not in conformance with GAAP because the defendants recorded revenue that had not yet been earned.  SAC ¶ 127. Finally, the Restatement elaborates on instances where the company's controls were "not effective to reasonably ensure accurate recognition of revenue in accordance with GAAP," including "[r]evenue recognition practices for sales to the Company's distributors," and "[o]versight of certain foreign subsidiaries."  SAC ¶ 113.  According to the plaintiff, these instances include both the "dope deals" and Brasil's distributor sales, among other things.  Consequently, the defendants' representation that Orthofix had effective internal controls over financial reporting at that time was false and materially misleading.

Orthofix's executives are paid annual performance-based bonuses that are tied to the company's "immediate financial performance," among other retention bonuses.  SAC ¶ 155.  When Orthofix restated its financial statements in March 2014, all of its numbers were adjusted downward, except for the 2010 fiscal year, which the plaintiff alleges increased due to revenue rolling forward from 2008 and 2009 after it had been inappropriately recognized in those years.  SAC ¶ 154. According to the plaintiff, the individual defendants misrepresented and inflated Orthofix's revenue in order to receive higher annual bonuses.  SAC ¶ 155.

### III.

Section 10(b), as effectuated by Rule 10b–5, makes it
"unlawful for any person . . . [t]o make any untrue statement of
a material fact or to omit a material fact necessary in order to
make the statements made, in the light of the circumstances
under which they were made, not misleading."  17 C.F.R.
§ 240.10b–5(b).  To state a claim under Section 10(b) and Rule
10b–5, the plaintiff must allege that the defendants, in
connection with the purchase or sale of securities, made a
materially false statement or omitted a material fact, with
scienter, and that the plaintiff's reliance on the defendants'
action caused injury to the plaintiff.  Ganino v. Citizens
Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000); see also Silsby,
17 F. Supp. 3d at 358.  The defendants do not dispute that there
were material misstatements or omissions of fact.  The
defendants move to dismiss the asserted violations of Section
10(b) and Rule 10b–5 on the grounds that the plaintiff has
failed to allege sufficient facts to show loss causation and
scienter.

### A.

The defendants argue that this action should be dismissed
because the plaintiff has not alleged facts sufficient to
support a strong inference of scienter.  The scienter required
to support a securities fraud claim can be "intent to deceive,

18

manipulate, or defraud, or at least knowing misconduct." SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996) (internal citations omitted).  The PSLRA requires that a complaint alleging securities fraud "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  Scienter may be inferred from (i) facts showing that a defendant had "both motive and opportunity to commit the fraud," or (ii) facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness." ATSI, 493 F.3d at 99; see also City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc., 814 F. Supp. 2d 395, 418-19 (S.D.N.Y. 2011).

        In order to plead scienter adequately, the plaintiffs must allege facts supporting a strong inference with respect to each defendant.  See Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Trust Fund v. Arbitron Inc., 741 F. Supp. 2d 474, 488 (S.D.N.Y. 2010).  "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007). A complaint sufficiently alleges scienter when "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the

facts alleged." Id. at 324; see also Slayton v. Am. Express
Co., 604 F.3d 758, 766 (2d Cir. 2010).

In this case, the plaintiff does not attempt to allege
scienter by showing that the defendants had a "motive and
opportunity" to commit fraud, relying instead on the defendants'
alleged "conscious misbehavior or recklessness."[2]  Where the
defendants' motive to commit fraud is not apparent, "the
strength of the circumstantial allegations [that a defendant
consciously or recklessly misbehaved] must be correspondingly
greater." Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001).
Plaintiffs typically allege conscious or reckless misbehavior by
pleading with specificity that the defendants had "knowledge of
facts or access to information contradicting their public
statements." Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000).
As the Second Circuit Court of Appeals has explained,
"[r]eckless conduct is, at the least, conduct which is highly
unreasonable and which represents an extreme departure from the
standards of ordinary care . . . to the extent that the danger
was either known to the defendant or so obvious that the
defendant must have been aware of it." Chill v. Gen. Elec. Co.,

---

[2] Indeed, the only motive to inflate revenue alleged in the Complaint is the
individual defendants' desire to increase their annual bonuses.  SAC ¶ 155.
Such incentives are "possessed by virtually all corporate insiders," and
therefore "not sufficient to plead scienter through motive and opportunity."
Shemian v. Research In Motion Ltd., 570 F. App'x 32, 35 (2d Cir. 2014)
(summary order) (quoting S. Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d
98, 109 (2d Cir. 2009)).

101 F.3d 263, 269 (2d Cir. 1996) (alterations in original); see also Silsby, 17 F. Supp. 3d at 364-66.

The defendants argue that the plaintiff has not alleged facts sufficient to show that the individual defendants had knowledge of facts or access to information showing that Orthofix's financial statements were materially misleading or that Orthofix's internal controls had material weaknesses prior to July 2013, when Orthofix management first raised concerns that eventually led to the Restatement. Defendants McCollum, Vaters, and Buxton argue that the facts alleged against them are conclusory, not credible, and do not support an inference of scienter. Defendant Milinazzo argues that the plaintiff has not alleged any facts against him at all, other than that he signed SOX Certifications for several public disclosure documents.

### 1.

The plaintiff has failed to raise a strong inference of scienter with respect to Milinazzo. The only facts alleged against Milinazzo in the Second Amended Complaint are that he signed SOX Certifications for the company's public disclosure documents, and one conclusory allegation that "Defendants Vaters and McCollum instituted a culture of revenue-at-all costs, and, along with Milizzano [sic], promoted a variety of other improper revenue recognition practices." SAC ¶ 152. The plaintiff cannot raise an inference of fraudulent intent based on the

21

signing of a certification without alleging any facts to show a concomitant awareness of or recklessness to the materially misleading nature of the statements.  See Glazer Capital Mgmt. v. Magistri, 549 F.3d 736, 747 (9th Cir. 2008) (concluding that absent a showing of recklessness, the fact of an officer's SOX certification is "not sufficient, without more, to raise a strong inference of scienter on the part of [the certifying officer]"); Garfield v. NDC Health Corp., 466 F.3d 1255, 1266 (11th Cir. 2006) (holding that an officer's SOX certification alone is not probative of scienter; rather, the plaintiff must allege facts showing the officer was "severely reckless" in certifying the accuracy of the financial statements). Accordingly, defendant Milinazzo's motion to dismiss the plaintiff's claim under Section 10(b) and Rule 10b-5 against him is **granted.**

### 2.

The allegations against Vaters and McCollum regarding Orthofix's alleged "dope deals" are significantly more particularized than the allegations against Milinazzo.  The plaintiff describes in detail Orthofix's alleged practice of making bulk sales to distributors combined with large discounts on those sales on separate contracts, and then reporting the full undiscounted amount of the sale as revenue.  Based on confidential sources, the plaintiff alleges that Vaters was

involved in this program, and that McCollum assumed a role in the program when he became President of the Global Spine Unit. SAC ¶ 41.  The defendants respond that the Court cannot credit the plaintiff's confidential witnesses because there is no showing that the witnesses "had any contact with the Individual Defendants or would have knowledge of what they knew or should have known during the Class Period."  In re Am. Express Co. Sec. Litig., No. 02cv5533, 2008 WL 4501928, at *8 (S.D.N.Y. Sept. 26, 2008), aff'd sub nom. Slayton v. Am. Exp. Co., 604 F.3d 758 (2d Cir. 2010).

This argument is without merit.  "Information presented through Confidential Witnesses in a complaint is allowed as long as the witnesses 'are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess[] the information alleged.'"  Cornwell v. Credit Suisse Grp., 689 F. Supp. 2d 629, 637 (S.D.N.Y. 2010) (quoting Novak, 216 F.3d at 314).  The confidential witnesses that describe the discounted bulk sales include CW 1, an Orthofix distributor, CW 2, the President of another company, and CW 3, Orthofix's Director of Sales for Spinal Stimulation for four years, each of whom played some role in the bulk sales.  SAC ¶¶ 37, 47, 51.  CW 3, who describes the involvement of Vaters and McCollum, interacted directly with Bryan McMillan about the bulk sales, and when McCollum filled

McMillan's position, the practice allegedly continued.  SAC
¶ 51.  The CWs' identities here are sufficiently particular to
make it probable that they possessed the information alleged.
See, e.g., In re Scottish Re Grp. Sec. Litig., 524 F. Supp. 2d
370, 392-93 (S.D.N.Y. 2007) (crediting witnesses who "occupied
positions that would have allowed for relevant hands-on
experience in various parts of the Company").

Although several courts within this District have declined
to credit the allegations of confidential witnesses where they
do not specifically allege "contact" with the individual
defendants, see, e.g., Glaser v. The9, Ltd., 772 F. Supp. 2d
573, 589-90 (S.D.N.Y. 2011), there is no baseline requirement of
such contact in order to allege "sufficient particularity to
support the probability that a person in the position occupied
by the source would possess the information alleged." Novak,
216 F.3d at 314.  In this case, it is "highly probable" that the
regional director of sales in a region, who has interacted
directly with a President of that unit in the past, would be
"well-positioned to attest to the participation of the
individual defendants in promoting" certain sales practices in
that region.  In re EVCI Colleges Holding Corp. Sec. Litig., 469
F. Supp. 2d 88, 97 (S.D.N.Y. 2006) (crediting the testimony of
confidential witnesses without regard to their contact with the
individual defendants).

24

The defendants argue that even if this Court were to credit the confidential witnesses' account of Orthofix's discounted sales, discounted sales are a common practice in the industry, and the plaintiff has not alleged anything to show that Vaters and McCollum were aware of anything improper.  This argument misses the full picture of wrongdoing presented by the plaintiff.  While "offering discounts to stimulate sales is not automatically manipulation and may well stimulate demand," In re Smith & Wesson Holding Corp. Sec. Litig., 669 F.3d 68, 76 (1st Cir. 2012), the plaintiff has alleged that Vaters and McCollum directed bulk sales that were recorded in full in Orthofix's revenue calculations despite discounts outside of the sales contract that essentially nullified any revenue gain.  SAC ¶ 51.  The plain import of the program in which Vaters and McCollum were allegedly directly involved was to boost revenue artificially at the end of quarters in order to present a false and misleading picture of Orthofix's actual revenue.  There are sufficient allegations that Vaters and McCollum acted deliberately or recklessly in promoting this program.

GAAP requires that income not be recognized until it is "realized or realizable" and "earned," SAC ¶ 122 (citing Financial Accounting Standards Board ("FASB") Concepts Statement No. 5, ¶ 83), and the SEC cautions that parties entering into "side agreements" to contracts affecting revenue recognition

25

must have sufficient controls to ensure that they are accounted for in accordance with GAAP.  SAC ¶ 126 (citing SEC Staff Accounting Bulletin No. 101: Revenue Recognition in Financial Statements, 17 C.F.R. Part 211, at 4 (Dec. 3, 1999)).  Indeed, among its concessions regarding material misstatements and weaknesses in internal controls, Orthofix's Restatement noted "extra-contractual terms or arrangements at the onset of sale," and that such terms "were not evaluated, or not evaluated correctly" in the company's files.  SAC ¶¶ 110, 113.  The plaintiff has alleged sufficient facts that raise a strong inference that Vaters and McCollum were aware of the revenue recognition problems that gave rise to the Restatement.  See Varghese v. China Shenghuo Pharm. Holdings, Inc., 672 F. Supp. 2d 596, 608 (S.D.N.Y. 2009) (holding that scienter requirement was met where GAAP violations led to restatement and individual defendants were aware of "weak internal controls").

### 3.

The plaintiff alleges that it has raised a strong inference of scienter at least with regard to defendant Buxton based on Orthofix do Brasil's allegedly improper revenue recognition practices.  The plaintiff alleges that Brasil mounted an aggressive campaign to increase recorded revenue by making large volume sales to distributors with "loosened terms," rendering collection of payment for those sales less likely.  According to

the plaintiff, Buxton's awareness or reckless disregard of the accounting treatment of these sales is shown by, among other things, her presence at a meeting where concerns about distributor sales were discussed and by the fact that reports were sent to her showing the rapidly increasing receivables and loosened terms.  One confidential witness also alleges that the loosened terms were "shared with top management."  SAC ¶ 76.

The defendants contend that the reference to "top management" is too vague to support an inference of scienter with respect to any individual defendant.  See Plumbers & Pipefitters Local Union No. 719 Pension Trust Fund v. Conseco Inc., No. 09cv6966, 2011 WL 1198712, at *23 (S.D.N.Y. Mar. 30, 2011) (holding that "vague allegations" against unnamed "executives" and "senior . . . employees" do not raise a strong inference of scienter).  However, unlike in Conseco, the allegation that the terms were shared with "top management" is supported by additional specific allegations as to Buxton's scienter.  The defendants respond that the plaintiff's allegations of what was said at the meeting and what was in the reports sent to Buxton are too vague to support a strong inference of scienter, and that the plaintiff fails to allege that Buxton ever read the reports.

The plaintiff's allegations about the Germany meeting and the reports are not conclusive, but the plaintiff does not need

27

a smoking gun to allege sufficient facts to support a strong inference of scienter.  The plaintiff argues that the meeting in Germany supports Buxton's knowledge of Brasil's issues with sales to distributors, but the Second Amended Complaint only states, "Several issues were discussed, including practices concerning sales to distributors in France, Italy, and Brazil. In particular, the *Italian* representatives expressed concerns over their sales to distributors."  SAC ¶ 78 (emphasis added). The plaintiff argues that the reports sent to Buxton put her on notice of the loosened terms in the sales to distributors, but the Second Amended Complaint's description of those reports is imprecise, stating that "[t]he reports contained data showing that there was a trend of many months of fast-increasing receivables, and thus that clients were effectively being financed by Orthofix do Brasil."  SAC ¶ 77.  A separate confidential witness alleged that "the changes in sales to distributors, as well as the effects of the relaxed policies, were easy to see in the financial reports . . . .  These reports showed there were discounts of as much as 70% given to distributors."  SAC ¶ 87.

At the motion to dismiss stage, the Court must read the Complaint "*in toto* and most favorably to [the] plaintiff."  In re Regeneron Pharm., Inc. Sec. Litig., No. 03cv3111, 2005 WL 225288, at *24 (S.D.N.Y. Feb. 1, 2005) (citation and quotation

marks omitted).  Read most favorably to the plaintiff and
accepting the Complaint's allegations as true, the above
allegations raise an inference that Buxton either knew or had
access to information about Brasil's large sales increases with
loosened terms, and thus possessed information contrary to her
public statements in the SOX Certifications regarding the
adequacy of Orthofix's revenue recognition practices.  See
Cornwell, 689 F. Supp. 2d at 637 (finding scienter met where the
plaintiff alleged that "executives reviewed specific reports
that should have alerted them to the problems they later
allegedly misrepresented"); In re AOL Time Warner, Inc. Sec. &
"ERISA" Litig., 381 F. Supp. 2d 192, 221-22 (S.D.N.Y. 2004)
(finding scienter met based on individual defendant's position
as "the executive most responsible for the Company's accounting"
and attendance at meetings where issues were discussed).  The
facts alleged by the plaintiff, coupled with Orthofix's later
admission in the Restatement that there were failures in revenue
recognition practices with respect to sales where "collection
was not reasonably assured" and "sales comprised of higher risk
distributor revenues" at "certain foreign subsidiaries," SAC
¶¶ 110, 113, raise a strong inference of scienter with respect
to Buxton.

     The defendants argue that the plaintiff does not
specifically allege that Buxton read the reports, but such an

allegation is not required in this case.  Buxton was the CFO of
Orthofix's Global Orthopedics Unit at the time, and the
plaintiff has alleged that the reports were sent to her and that
she discussed Brasil's finances, the subject matter of those
reports, with Brasil's financial director.  SAC ¶¶ 29, 77, 87.
Therefore, information regarding the loosened terms was
"reasonably available" to Buxton, and she either knew about the
information or showed a reckless disregard for it.  See Novak,
216 F.3d at 308 (allegations of recklessness may be sufficient
"where plaintiffs alleged facts demonstrating that defendants
failed to review or check information that they had a duty to
monitor").

Orthofix also argues that for the Implamed sale, the
plaintiff has not alleged sufficient facts to establish scienter
for any individual defendant.  It is not necessary to reach the
issue of whether scienter is established for the Implamed sale
because the plaintiff argues that McCollum is the only defendant
implicated, and the Court has already concluded that the
plaintiff has alleged sufficient facts to establish scienter as
to McCollum.

### 4.

In order to determine whether a plaintiff has established
scienter, courts must "engage in a comparative evaluation,"
considering "not only inferences urged by the plaintiff . . .

but also competing inferences rationally drawn from the facts alleged." Tellabs, 551 U.S. at 314.  The defendants argue that there are compelling inferences either that "no one responsible for the [financial] statements made to investors had reason to believe" those statements were incorrect when issued, or that the Restatement was "the result of merely careless mistakes at the management level based on false information fed it from below."  Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 197 (2d Cir. 2008).  However, the Court has already found that the plaintiff has made specific factual allegations that Vaters, McCollum, and Buxton each had reasons to know that their statements in the SOX certifications were false or misleading.  Moreover, additional considerations contribute to the strong inference of the defendants' scienter in this case.

As shown by Orthofix's Restatement, Orthofix undisputedly has made material misstatements and admitted to violations of GAAP.  The GAAP regarding revenue recognition that were admittedly violated by the defendants are basic accounting principles.  See S.E.C. v. Egan, 994 F. Supp. 2d 558, 565 (S.D.N.Y. 2014) ("Allegations that the accounting rules are straightforward and the company's accounting treatment was obviously wrong may create an inference of scienter.") (citation and quotation marks omitted).  GAAP violations, accounting

irregularities, and the issuance of a restatement, "standing alone, are insufficient to state a securities fraud claim." Novak, 216 F.3d at 309; City of Brockton Ret. Sys. v. Shaw Grp. Inc., 540 F. Supp. 2d 464, 472 (S.D.N.Y. 2008) ("[I]t is well settled that mere fact of a restatement of earnings does not support a strong, or even a weak, inference of scienter."). However, when "coupled with evidence of 'corresponding fraudulent intent,'" a restatement or accounting violations may provide some evidence of scienter.  Novak, 216 F.3d at 309 (quoting Chill, 101 F.3d at 270); In re Dynex Capital, Inc. Sec. Litig., No. 05cv1897, 2009 WL 3380621, at *15 (S.D.N.Y. Oct. 19, 2009).  In this case, the plaintiff has paired Orthofix's admissions in the Restatement with sufficient factual allegations to create a strong inference of scienter for Vaters, McCollum, and Buxton.

The Second Circuit Court of Appeals has held that the size of the purported fraud may also contribute to an inference of scienter.  See In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 77 (2d Cir. 2001) (holding that a total of $24 million in charges "undermines, at the pleading stage, the argument that the defendants were unaware" of any increase in returns); Rothman v. Gregor, 220 F.3d 81, 92 (2d Cir. 2000) (deeming significant the "magnitude" of a defendant's write-off in determining scienter).  Although the defendants point to the

fact that the Restatement did not uniformly lower Orthofix's net
income across the fiscal years it corrected, the only increase
was by $100,000 in 2010, from $44.2 million to $44.3 million.
SAC ¶ 16.  In contrast, the Restatement revised every other year
downward, the first quarter of 2013 from $12.0 million to $9.4
million (a 22% decrease), the fiscal year 2012 from $51.3
million to $42.8 million (a 17% decrease), and the fiscal year
2011 from a $1.1 million loss to an $18.1 million loss (a
roughly 1600% decrease).  These numbers are large enough to
render less credible the defendants' arguments that they had no
notice of any of the accounting improprieties that led to the
Restatement.  See In re Scholastic, 252 F.3d at 77.

     Moreover, the timing and circumstances of individual
defendants' resignations may add some further weight to an
overall inference of scienter.  See In re OSG Sec. Litig., 12 F.
Supp. 3d 622, 633 n.84 (S.D.N.Y. 2014) (collecting cases).  The
plaintiff alleges that on March 12, 2013, Orthofix announced
that Vaters, then President and CEO, would resign from the
company immediately, and on June 18, 2013, Orthofix announced
that McCollum, then Vice President of Finance and CFO, would
resign from the company less than one month later.  SAC ¶¶ 27-
28, 141, 143.  These resignations occurred in the lead-up to
Orthofix's announcement on July 29, 2013, that it would delay
filing its quarterly report for the second quarter of 2013,

which ultimately led to issuance of the Restatement.  The timing and circumstances of the resignations of Vaters and McCollum thus lend further weight to an inference of scienter.

In light of the foregoing, a reasonable person would deem an inference of scienter for defendants Vaters, McCollum, and Buxton "at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 551 U.S. at 324. Accordingly, their motion to dismiss the plaintiff's claims under Section 10(b) and Rule 10b-5 as against them is **denied.**

### 5.

Orthofix moves to dismiss the plaintiff's Section 10(b) claim as against it, arguing that the plaintiff has failed to plead scienter by the corporation.  But because the Second Amended Complaint properly alleges scienter against three key officers of Orthofix, it necessarily alleges scienter against Orthofix itself. See Dynex Capital, 531 F.3d at 195 ("In most cases, the most straightforward way to raise [an inference of scienter] for a corporate defendant will be to plead it for an individual defendant."); Arbitron, 741 F. Supp. 2d at 491 ("Because the plaintiffs have successfully pleaded scienter as to . . . Arbitron's then-president, CEO, and chairman, they have also pleaded corporate scienter as to Arbitron."); see also City of Roseville, 814 F. Supp. 2d at 420.  Accordingly, Orthofix's motion to dismiss the plaintiff's Section 10(b) claim is **denied.**

34

### B.

The defendants argue that the plaintiff has failed to plead that the alleged misrepresentations and omissions caused the plaintiff's loss.  To allege loss causation under Section 10(b) and Rule 10b-5, the plaintiff must provide in the Second Amended Complaint "notice of what the relevant economic loss might be and what the causal connection might be between that loss and the [alleged] misrepresentation."  Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 347 (2005).  To provide the requisite notice, the plaintiff must plead economic loss and either "that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement," ATSI, 493 F.3d at 107, or "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."  Lentell v. Merrill Lynch & Co., 396 F.3d 161, 173 (2d Cir. 2005); see also In re New Oriental Educ. & Tech. Grp. Sec. Litig., 988 F. Supp. 2d 406, 428 (S.D.N.Y. 2013).  "[P]artial disclosures can satisfy the loss causation requirement."  Freudenberg v. E*Trade Fin. Corp., 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010).

The plaintiff argues that the defendants' misstatements or omissions first materialized on July 29, 2013, when Orthofix announced that it would be delaying the release of its financial

35

statement for the second quarter of 2013 in order to "review matters relating to revenue recognition for prior periods."  SAC ¶ 145.  Following that disclosure, the price of Orthofix stock dropped by 17%.  The defendants argue that this announcement was not a corrective disclosure because it did not reveal any misconduct.  The defendants rely heavily on Loos v. Immersion Corp., 762 F.3d 880 (9th Cir. 2014), a recent opinion in which the Ninth Circuit Court of Appeals held that the plaintiff had not sufficiently pleaded loss causation because the "announcement of an investigation, without more, is insufficient to establish loss causation."  Id. at 890.  However, the Court made clear that it was not suggesting that the announcement of an investigation can "never form the basis of a viable loss causation theory," and noted that the announcement may be sufficient if it "contains an express disclosure of actual wrongdoing."  Id. at 890 n.3.  Although Orthofix did not expressly disclose wrongdoing in its announcement, it did state that it would be reviewing "revenue recognition for prior periods" with the assistance of independent auditors, and shortly thereafter it announced that it would be restating its revenue for prior periods.  SAC ¶¶ 145, 147.

In any event, Loos is plainly not controlling within the Second Circuit, and this Court and other courts within this District have concluded that the disclosure of an investigation

"into a particular business practice can be sufficient to allege loss causation with respect to alleged misstatements regarding that practice."  In re New Oriental, 988 F. Supp. 2d at 428; see also In re IMAX Sec. Litig., 587 F. Supp. 2d 471, 485-86 (S.D.N.Y. 2008) (finding public disclosure of SEC investigation into company's "multiple element accounting" sufficiently specific to constitute corrective disclosure with respect to misstatements about application of that accounting procedure); In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d 247, 286-90 (S.D.N.Y. 2008) (finding public disclosure of SEC investigation "into certain stock option grants" sufficiently specific to constitute corrective disclosure with respect to alleged misstatements about process for granting stock options). The defendants attempt to distinguish those cases on the grounds that the announcements in those cases disclosed SEC investigations, and Orthofix only disclosed an internal investigation that would be conducted with the assistance of outside professionals.  However, in determining whether loss causation is established, the dispositive question is not which type of entity announced an investigation, or how strongly worded the announcement was, but rather whether the plaintiff has alleged a "causal connection" between the loss and the alleged misrepresentations.  Dura, 544 U.S. at 347.  In this case, the July 29 announcement "revealed to the market a

37

potential problem" with the defendants' revenue recognition practices that had been previously concealed by the defendants' now-undisputed misstatements in its prior financial disclosures. See In re New Oriental, 988 F. Supp. 2d at 428.  Following this announcement, the price of Orthofix shares declined from $27.40 to $22.71 per share on July 31, falling approximately 17% on about two days of trading.  Accordingly, the July 29 announcement is sufficient to establish loss causation.

## IV.

The plaintiffs also allege that the individual defendants and Orthofix are liable under Section 20(a) of the Exchange Act because they controlled Orthofix, which in turn violated Section 10(b) and Rule 10b-5.  Section 20(a) provides:

> Every person who, directly, or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  ATSI, 493 F.3d at 108.  The individual

defendants argue that they are not liable under Section 20(a), first, because Orthofix did not violate Section 10(b) and Rule 10b-5, and second, because none of the individual defendants were culpable participants in Orthofix's alleged fraud. The first argument fails because, as discussed above, there are sufficient allegations of Orthofix's liability. Similarly, with respect to the second argument, there are sufficient allegations as to the culpable participation of Vaters, McCollum, and Buxton. However, there are insufficient allegations concerning the culpable participation of defendant Milinazzo. Therefore, the Section 20(a) claim is **dismissed** only against defendant Milinazzo.

**CONCLUSION**

The Court has considered all of the remaining arguments of the parties. To the extent not specifically addressed above, they are either moot or without merit. For the foregoing reasons, the defendants' motion to dismiss is **granted in part and denied in part.** The claims against defendant Milinazzo are **dismissed with prejudice** and the motion to dismiss is otherwise **denied. The Clerk is directed to close Docket Nos. 49, 53, 63, and 66.**

SO ORDERED.

Dated:      New York, New York
            March 6, 2015            _____/S/_____
                                          John G. Koeltl
                                    **United States District Judge**

40