G4T5sinC                    conferenc

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    PLUMBERS & PIPEFITTERS
     NATIONAL PENSION FUND, *et al.*,
4
                     Plaintiffs,
5
              v.                            13 Civ. 5696 (JGK)
6
     ORTHOFIX INTERNATIONAL N.V.,
7    *et al.*,

8                    Defendants.

9    ------------------------------x

10                                          April 29, 2016
                                            3:05 p.m.
11   Before:

12                   HON. JOHN G. KOELTL,

13                                          District Judge

14

15

16

17

18

19

20

21

22

23

24

25

G4T5sinC                    conferenc

1                              APPEARANCES

2   COHEN, MILSTEIN, SELLERS & TOLL, PLLC
         Attorneys for Plaintiffs
3   BY:  DANIEL S. SOMMERS
         CAROL V. GILDEN
4        GENEVIEVE O. FONTAN

5   HOGAN LOVELLS, US, LLP (NYC)
         Attorneys for Defendant Orthofix
6   BY:  DAVID F. WERTHEIMER
         KEVIN BOWMAN

7
    LANKLER, SIFFERT & WOHL
8        Attorneys for Defendant McCollum
    BY:  LEIGH G. LLEWELYN

9
    PAUL HASTINGS, LLP (NY)
10       Attorneys for Defendant Vaters
    BY:  SHAHZEB LARI

11
    KING & SPALDING, LLP (NYC)
12       Attorneys for Defendant Buxton
    BY:  ERIC A. HIRSCH

13

14

15

16

17

18

19

20

21

22

23

24

25

G4T5sinC                           conferenc

1          (Case called)

2          MR. SOMMERS:  Good afternoon, your Honor.  Daniel

3     Sommers, Cohen, Milstein, Sellers & Toll on behalf of leading

4     plaintiff, and with me this afternoon are Genevieve Fontan and

5     Carol Gilden from my firm.

6          THE COURT:  Good afternoon.

7          MR. WERTHEIMER:  Good afternoon, your Honor.  David

8     Wertheimer, Hogan Lovells for Orthofix International, and with

9     me is my colleague Kevin Bowman.

10          MR. LLEWELYN:  Good afternoon, your Honor.  Leigh

11     Llewelyn of Lankler, Siffert & Wohl for Brian McCollum.

12          MR. LARI:  Good afternoon, your Honor.  Shahzeb Lari

13     from Paul Hastings for Defendant Vaters.

14          MR. HIRSCH:  Good afternoon, your Honor.  Eric Hirsch

15     from King & Spalding for Defendant Emily Buxton.

16          THE COURT:  Good afternoon, all.

17          This is a motion to approve the settlement and approve

18     the application for attorney's fees and to approve the

19     settlement class for the purposes of the settlement.

20          Okay.  I have read the papers.  I am happy to listen

21     to you all.

22          MR. SOMMERS:  Your Honor, Daniel Sommers again for the

23     lead plaintiff.

24          As the Court mentioned, before the Court is the motion

25     for final approval of the proposed settlement.  The settlement

G4T5sinC                              conferenc

1    provides for, among other things, a payment of $11 million to

2    the class.  If granted final approval, the settlement would

3    resolve all claims and all defenses in this litigation.  In

4    accordance with the Court's December 18, 2015 order

5    preliminarily approving the settlement, a notice program was

6    commenced.  In connection with that program 15,562 notices were

7    disseminated to identifiable class members.  In addition,

8    summary notices were published in the PR Newswire and in

9    Investors Business Daily on January 20th.  Likewise, a website

10   was established pursuant to the Court's order by the settlement

11   administrator, and on that website all of the relevant

12   documents in connection with this settlement had been posted

13   including the redacted version of the supplemental agreement,

14   per your Honor's instructions.

15           That website, as of April 20th, received over 1,300

16   inquiries from potential class members.  In addition, the

17   settlement administrator established a toll-free number for

18   investors to call if they had questions and that has been

19   accessed as well.

20           As of April 7th, which was the deadline for filing

21   objections and requests for exclusion from the class, not a

22   single objection was received and not a single request for

23   exclusion has been received, facts that we consider to be

24   significant in consideration of a fairness and reasonableness

25   and adequacy to the settlement.

1          THE COURT:  April 7th was the deadline.  By bringing

2     it up right to today, have you received any objections?

3          MR. SOMMERS:  There have been no objections received

4     as of today, certainly to my knowledge.  It would have been

5     called to my attention.

6          THE COURT:  Right.

7          MR. SOMMERS:  And there have been no requests for

8     exclusion that have been received up to this moment, again, as

9     far as to my knowledge.

10          An addition and important fact is that as of the

11     claims filing deadline which was April 6th of this year, 4,733

12     claims were filed pursuant to the declaration put in by the

13     settlement administrator.  We have been advised that

14     subsequently 99 additional claims have been filed bringing the

15     total to 4,832 claims filed.

16          With respect to the settlement, I would like to just

17     address it in two parts.

18          THE COURT:  Do you have some estimate with 4,832

19     claims how much each claimant will then get?

20          MR. SOMMERS:  I don't, your Honor, and candidly it is

21     a bit early in the process.  When I reference that claims had

22     been filed, I would expect that most of them will be valid in

23     whole or in part but it is certainly possible that some will

24     ultimately be determined to be invalid and the administrator's

25     process has not yet gotten to the point of actually calculating

G4T5sinC                      conferenc

1   what the recognized loss would be for each of those potential

2   class members.

3          THE COURT:  Okay.

4          MR. SOMMERS:  With respect to the settlement and the

5   briefing that we put in as to why we believe the settlement is

6   fair, reasonable, and adequate, I would first like to just

7   address the process by which the settlement was reached as

8   indicia of the fairness and reasonableness and adequacy of the

9   settlement.

10         The settlement was only reached after there had been

11  substantial work performed by lead counsel.  We had done a

12  significant pre-filing investigation before the filing of the

13  two amended complaints that were submitted in this matter.  We

14  identified over 160 witnesses, many of whom were in various

15  countries in South America and Europe and interviewed 59 of

16  them including, in some cases, interviewing witnesses more than

17  once.  We drafted two extensive complaints, the second of which

18  was ultimately tested by a very comprehensive motion to dismiss

19  filed by the group of defendants that are here and one

20  additional defendant raising multiple legal issues.  That

21  motion was ruled on by the Court, denied as to all defendants,

22  save one.  After that ruling, we began negotiations over the

23  terms of a very extensive document production which ultimately

24  resulted in our receipt of four and a half million pages of

25  materials from Orthofix.  All of those materials were subject

G4T5sinC                              conferenc

1     to an extensive review process by lead counsel for the

2     plaintiffs.

3            At the same time, we embarked on non-party discovery

4     including serving 13 subpoenas on U.S.-based entities, one of

5     which was Ernst & Young which acted as the outside auditor for

6     Orthofix.  At the same time, we also commenced the process of

7     seeking documents from 12 non-U.S. entities utilizing the

8     rather complicated procedures of the Hague Convention and

9     letters rogatory and we had to call on the Court's assistance

10    here to effectuate some of that but we were able to seek

11    documents from various countries including Brazil, Columbia,

12    Mexico, Italy, Spain, Greece, South Korea, the United Kingdom

13    and Turkey and not from the companies but customs and business

14    entities that did business in those countries.

15           We also had the opportunity to engage experts to

16    consult within the areas of accounting which were central to

17    the allegations in this case.  Because of the international

18    nature of the case, we had to engage the services of

19    translators and others to assist us in navigating the non-U.S.

20    discovery portion of the case and, in addition, we had

21    consulted with an expert in the area of causation, materiality,

22    and damages.

23           On top of all of that, as the Court knows, we agreed

24    to engage in private mediation process.

25           THE COURT:  The discovery process never got to the

1    point of actually taking any depositions?

2             MR. SOMMERS:  There were no formal depositions taken

3    in this case, your Honor.  In the mediation process we engaged

4    a well-regarded mediator, there was a very thorough process,

5    extensive mediation briefs were submitted.  I think we

6    referenced in our papers that we, alone, submitted

7    approximately 100 exhibits culled from the massive amount of

8    documents that we had obtained in the case.  In addition, the

9    mediation process was engaged in by very capable counsel.

10   Orthofix was not only represented by litigation counsel, it had

11   insurance counsel and so the process was, in our view, a fair

12   process by which the settlement was reached, the parties were

13   fully informed, certainly lead plaintiffs were fully informed

14   about the risks and weaknesses and strengths of the case.

15   There was a credible mediation process that took place and the

16   entire process was fully adversarial, at arm's length, and I'm

17   not aware of any evidence to the contrary.

18             With regard to the substance and to the standards that

19   the Second Circuit have set forth in the *Grinnell* case, we

20   believe that the settlement satisfies each of the standards

21   that the *Grinnell* Court directed district courts to focus on.

22             First, with regard to the complexity, expense, and

23   likely duration of the litigation, 10b-5 class actions are well

24   known to be complex.  This was a multi-party action, there were

25   complex accounting issues that were involved.  As I had stated

G4T5sinC                          conferenc

          earlier, there was a significant non-U.S. component to the case

 2        which raised a variety of discovery issues and evidentiary

 3        issues that we did confront and would continue to confront had

 4        the case continued.  As a result of that, this case was an

 5        expensive case to litigate, it required experts.  It would have

 6        required additional expenses had we continued on through the

 7        discovery process, and moreover, in terms of duration on

 8        appeals I think would be a certainty in this case.  There were

 9        a number of legal issues that were raised on motion to dismiss

10        that were likely to be subject of appeal.

11             THE COURT:  Your requests for some discovery under the

12        Hague Convention were rejected by the countries to which they

13        were directed, weren't they?

14             MR. SOMMERS:  No, your Honor.  My recollection is not

15        clear as between those which were the Hague Convention and

16        where we used the letters rogatory but we actually, as we

17        approached the mediation process in late September of last

18        year, were receiving responses from the various judicial

19        authorities in certain countries, that those responses were

20        forthcoming.  We had to put those on hold because we had

21        achieved an agreement in principal.  But, I don't recall that

22        any country flatly rejected our request.  I don't know whether

23        we would have been successful, ultimately, in obtaining

24        documents from various countries.  That, of course, remains --

25             THE COURT:  I thought I had recalled some returns from

G4T5sinC                          conferenc

1    some countries which had rejected the request for documents as

2    discovery that was not permitted under the rules of those

3    countries.

4            MR. SOMMERS:  Your Honor's recollection is better than

5    mine.  I have just been informed that two countries did in fact

6    reject the request -- South Korea and the United Kingdom -- and

7    then there were a variety of other countries that were in the

8    process of trying to comply but did not.

9            The second factor that the *Grinnell* Court points to

10   and one which we find is very significant is the action of the

11   class to the settlement.  As I indicated earlier, we have not a

12   single objection, not a single request for exclusion.  The

13   settlement provided that the defendants were to send out a

14   notice that was required by CAFA and the Class Action Fairness

15   Act to various state and federal law enforcement officers.  We

16   had not a single negative response or any response from that.

17           So, all of these factors we think give the Court a

18   sufficient amount of negative assurance that there was -- there

19   is no opposition to approval of the settlement but, more

20   importantly, I think the Court has affirmative evidence now

21   because the claims deadline has passed and the Court now knows

22   of the substantial class members who are affirmatively seeking

23   to participate in the class.  And so, we have a claims rate now

24   of close to 30 percent which for these types of cases is at the

25   very high end and we think speaks powerfully to support

G4T5sinC                          conferenc

1   approval of the settlement.  And, moreover, we have the

2   affirmative support of a lead plaintiff in this case which is a

3   sophisticated institutional investor and believe that carries

4   weight through and gives the court affirmative assurances to

5   reaction of the class.

6           THE COURT:  Do you know of the other claimants?  How

7   many institutional investors who were claimants?

8           MR. SOMMERS:  Yes, your Honor.

9           The class is predominantly comprised of institutional

10  investors.  During the class period our data shows that 90

11  percent of the shares of or Orthofix were institutionally held

12  by a variety of institutions.  I have not looked to see who the

13  specific members are but we do know that this class is a class

14  that is comprised, principally, of sophisticated investors and,

15  again, another factor which we think speaks favorably toward

16  approval of the settlement.

17          The stage of proceedings is another factor the Second

18  Circuit looks to.  Here, as I stated earlier while we did not

19  get into deposition discovery, there was substantial informal

20  discovery, substantial investigation, and all the other items

21  that I have addressed -- the complaints, the motion practice,

22  the extensive document discovery that took place, the

23  consultation with experts -- the case was substantively fairly

24  well advanced and certainly put counsel in a position to

25  understand the strengths and weaknesses and the risks involved

G4T5sinC                         conferenc

1   in continuing litigation.

2          The fourth factor that sort of blends in with the

3   other factors I have discussed which is the risks of

4   establishing liability and damages, and certainly the Court is

5   well aware that one of the principal issues in this case would

6   be our ability to ultimately plead that each of the defendants

7   acted with the requisite state of mind -- scienter -- while the

8   Court ruled on the motion to dismiss.  Obviously that was on

9   the pleadings and we ultimately would need to not only plead

10  that sufficiently but to prove it and that was going to be a

11  hotly contested issue.  In addition, Orthofix had a unique

12  defense which is that we had not adequately pled its

13  scienter -- corporate scienter -- and that would be a special,

14  unique issue as to the company.

15         The defendants also continue to raise issues of

16  causation and fact, also materiality, which presented clear

17  risks in the case.

18         As to damages, that was a hotly contested issue.  Some

19  of the material we have put into the record both on our

20  preliminary approval motion and on the motion that the Court is

21  considering today show that there were vastly divergent views

22  about damages.  It would have been a battle of experts as to

23  what the jury would have believed as to the proper approach to

24  damages and of course the defendants' principal argument is

25  that there were no damages at all.

G4T5sinC                         conferenc

1          Finally, the Second Circuit looks to the

2     reasonableness of the settlement in light of the best possible

3     recovery and the attendant risks along with that and here, as

4     we addressed in the preliminary approval order, we believe that

5     the recovery that we have obtained for the class falls squarely

6     within the range of a very good recovery between 10 and 20

7     percent of what we believe would be our proveable damages.  20

8     percent of the lower end and 10 percent of the most aggressive

9     damage model and, as we put it previously, the defendant's

10    damage model was completely different and that showed a range

11    of recovery for us under their theory of 70 to 120 percent.

12    But, under any of those numbers, we believe that the recovery

13    here is reasonable, falls well within the range of what the

14    Courts have approved in other cases.

15          So, your Honor, those are the comments with respect to

16    the settlement we addressed at the preliminary approval hearing

17    plan of allocation.  I can go through that unless the Court

18    wants me to stop here for a moment.

19          THE COURT:  No.

20          MR. SOMMERS:  Okay.

21          THE COURT:  Why don't you move on to attorneys fees.

22          MR. SOMMERS:  Okay.

23          Your Honor, we have requested a fee of 27.5 percent of

24    the settlement fund.  There were $3,025,000 reflecting 679

25    hours of work taken in this case as a result of lodestar with a

G4T5sinC                           conferenc

1    product of the hours times the hourly rate of $3,253,076.

2            For the Court's interest, I did go and look at what

3    that would translate to on a blended hourly rate and that rate

4    is $446.

5            THE COURT:  Sorry.

6            MR. SOMMERS:  The rate, $446 blended hourly rate for

7    all the time keepers.

8            THE COURT:  That includes all the contract lawyers?

9            MR. SOMMERS:  It does, your Honor.

10           THE COURT:  The notice said up to 28 percent.

11           MR. SOMMERS:  It did, and our request here is 27.5.

12           I would reiterate again that that was disclosed to the

13   class, the ceiling of our fee request, and that our submission

14   was put in before class members were required to elect whether

15   they were going to object to any aspect of the application and

16   again, not a single class member including all of the

17   sophisticated class members lodged any objections.

18           So, we think that the fee request is reasonable both

19   under the percentage of the fund approach and also under a

20   lodestar analysis.  With respect to that analysis, the Second

21   Circuit in *Goldberger* set forth the principal standards for the

22   Court to look at.  Some of these overlap with some of the

23   things I have said previously and I won't repeat them but the

24   Court looks to the time and labor expended and, clearly, a

25   substantial amount of time and labor was expended in achieving

G4T5sinC                          conferenc

1      this result.

2              The second factor from Goldberger talks about the

3      risks assumed in pursuing the action and as the Court is aware,

4      this action was taken on a wholly contingent basis.

5      Plaintiff's counsel has not received any compensation since the

6      inception of this action.  We have expended over $200,000 in

7      litigation expenses and none of those have been reimbursed to

8      us at this point.  And there was certainly no certainty that

9      this case would result in a positive recovery, notwithstanding

10     the fact that there was a restatement which does put out of

11     place certain elements of a 10b case.  It is law in this

12     circuit that a statement alone does not equate to proof of

13     scienter, that that takes more than just the fact of the

14     restatement and the defendants certainly had asserted strong

15     defenses here.  So, there were significant risks as to

16     liability, as to damages, and there were practical risks that

17     we faced especially with respect to the non-U.S. component of

18     the case where there were significant questions about our

19     ability to access discovery outside of the U.S. and, if we did,

20     there might be questions about the admissibility of some of the

21     evidence that we attempted to get.

22             The next factor is the magnitude and complexity of the

23     case and we addressed this a little bit earlier but we believe

24     this case certainly falls within the category of a complex

25     case.  There were many issues involved and complex accounting

G4T5sinC                          conferenc

1    issues, complex damages and causation issues.

2            The Second Circuit also requires the Court to look at

3    the quality of representation and we believe that the

4    representation in this case was good, that the class was well

5    represented.  Obviously it is for the Court to make a decision

6    on that.

7            Finally, there are public policy considerations that

8    the Second Circuit identifies or directs the district court to

9    review.  We believe this case is a good example of where

10   private securities action fulfills the mission of the federal

11   securities laws and the anti-fraud provisions of the securities

12   laws.  We have achieved a meaningful recovery for the class, a

13   fund of gross fund of $11 million, and we did note in our

14   papers and I think it is worth noting that the enforcement

15   division of the Securities and Exchange Commission has taken a

16   look at the same matters that are the subject of this

17   litigation, that it served the subpoena on Orthofix.  I don't

18   know much more about what the enforcement division was doing,

19   is doing now or may do in the future, but with all of the

20   advantages that the SEC has and all of the disadvantages that a

21   private litigant has, we were able to achieve a substantial

22   settlement fund now for investors.  So, we believe that that

23   speaks well of the settlement and speaks well for the fee

24   application.

25           The other factors that we believe support the fairness

G4T5sinC                      conferenc

of the fee request are going through the process that the Court

would go through, we looked to see what would be a fair range

of fees for this type of a case.  We believe that 27.5 percent

falls within that range.  I certainly recognize that in cases

courts have awarded less, sometimes a lot less, sometimes more,

and that there is no magic to the precise correct number.  But,

we looked at data we provided for the Court, a study done by

NERA which identified the median fee award in the last four or

five years for a case within this range of 27.5 percent.  There

are also cases obviously within that range that we cited in our

brief.  So, we believe those are supportive of the

reasonableness of the fee.

         We also look to the absence of any objections, the

affirmative claims rate which we think is important, the

affirmative support of the lead plaintiff which was set forth

in the Sweeney declaration, and as we discussed a little

earlier, the substantial institutional class membership and

participation and lack of any objection as to the 27.5 percent

requested fee.

         At the same time, we can look at the lodestar analysis

and we believe it corroborates the reasonableness of the fee we

are requesting.  We are not seeking any multiplier in the case.

In fact, it is sometimes referred to as a negative multiplier,

a .93 of our total lodestar amount, and we think the total

hours that were worked were reasonable and necessary in a case

G4T5sinC                        conferenc

1    of this magnitude.  The fee requested is not going to result in

2    a windfall for plaintiff counsel.  And I would also like to

3    point out that the allocation of time between partner time and

4    associate time in the case we believe was reasonable, and we

5    looked at the hours approximately 17 percent of the time worked

6    in the case was partner time and the balance non-partner time,

7    I think.

8             THE COURT:  About half was contract lawyers time.

9             MR. SOMMERS:  It was.  There was a significant amount

10   of contract lawyer work which was done to assist us in

11   reviewing documents.  That was principally why we did that.

12            So, we think all of these factors confirm why we think

13   that the fee that we are requesting is fair and is a fair and

14   reasonable fee under all the circumstances involved in the

15   case.

16            THE COURT:  Okay.  The only change on page 24 of your

17   brief with the corrected page was you were seeking $1,853 for

18   the lead plaintiff, right?

19            MR. SOMMERS:  That's correct, your Honor.  I apologize

20   for that error.

21            THE COURT:  No.  That's all right.

22            MR. SOMMERS:  We just got that the other day.

23            THE COURT:  Okay.  Thank you.

24            Defendants?

25            MR. WERTHEIMER:  Your Honor, I have nothing to add.

G4T5sinC                        conferenc

1    What plaintiffs counsel has said as to the reasonableness,

2    fairness, adequacy of the settlement and so forth and take no

3    position on the plaintiff's application for counsel fees.  I am

4    happy to address any questions the Court might have.

5              THE COURT:  No.  Thank you.

6              Individual defendants?

7              MR. LLEWELYN:  Nothing for Defendant McCollum, your

8    Honor.

9              MR. LARI:  Your Honor, nothing for Defendant Vaters.

10             MR. HIRSCH:  Nothing for Defendant Buxton, your Honor.

11             THE COURT:  Okay.  I have reviewed the papers and I

12   find that the settlement is fair, reasonable, and adequate.

13   The recitations in the proposed order and final judgment are

14   correct.  They reinforce the findings that he had made on the

15   preliminary approval of the settlement.  The settlement was

16   procedurally fair, it was arrived at at arm's length with no

17   indication of any collusion, it was arrived at with the

18   assistance of a mediator.  It is substantively fair, it is the

19   resolution of a complex case that would have taken significant

20   additional resources to arrive at a final conclusion.  There

21   would have been a risk that the plaintiffs would not have

22   succeeded at the end of the day.  The motion to dismiss was

23   denied in substantial part but that was based on the pleadings.

24   It would have been a difficult and complex case to proceed

25   through discovery and trial.  Substantively, the recovery of

G4T5sinC                         conferenc

1    $11 million represents 10 percent of the plaintiffs' most

2    aggressive damages estimate and 20 percent of the plaintiffs'

3    more conservative estimate.   The defendant's damages expert

4    disagreed with the plaintiffs' estimated damages and would have

5    come up with a damages estimate to the extent that there were

6    damages of about 8 to 14 percent of the plaintiffs' damages

7    estimate so that the settlement was substantively fair given

8    the possibilities of what the plaintiffs could have recovered

9    at the end of trial.

10         So, I will approve the settlement.   I will approve the

11   definition of the class for purposes of the settlement.   I will

12   also find that the notice was the best notice practical under

13   the circumstances and satisfies Rule 23 and due process.   I

14   will also approve the attorney's fee, as sought.   It would not

15   be uncommon for me to reduce an attorney's fee that was sought

16   but in this case the attorney's fee came in at a reasonable

17   attorney's fee under any reasonable benchmark.   The award of

18   27.5 percent is slightly less than the class was advised would

19   be sought.   The lodestar -- the 27.5 percent translates to

20   $3,025,000 which is slightly less than the lodestar

21   $3,252,076.25.   The multiplier is actually a negative, the

22   multiplier is .93 of the lodestar.   So, the plaintiff is not

23   seeking an enhancement of the lodestar and the lodestar is

24   reasonable.

25         There was a substantial amount of effort and

1    reasonable attorneys fees that went into the factual

2    development of the case.  There were a large number of witness

3    interviews that were conducted as well as the substantial

4    amount of documentary review.  The attorneys fees were

5    efficiently expended.  There were a large number of contract

6    attorney hours that went into document review.  The ultimate

7    hourly rate was reasonable.  Moreover, it's plain that from

8    today forward there will continue to be attorney's fees

9    expended in terms of the supervision of the class distribution

10   and other issues that will arise in terms of the administration

11   of the settlement, none of which will be separately compensated

12   but which would be included within the attorney's fee that is

13   being sought.  That will drive the multiplier down even

14   further.

15          It is particularly significant in approving the

16   settlement and approving the attorney's fee that there have

17   been no objections from the class and no opt-outs from the

18   class and a significant number of claims that have already been

19   filed.  With respect to the attorneys fees, there have been no

20   objections to the attorneys fee despite the existence of

21   institutional investors.  The attorneys fee has also been

22   approved by the plaintiff who is a sophisticated investor.  So,

23   I should also add that the 8,153.60 payment to the plaintiff

24   for time expended by the plaintiff is also reasonable.

25          So, taking all of those factors into account I will

G4T5sinC                          conferenc

1    sign the order and final judgment.  I will also sign the

2    attorneys' fees order for the amounts requested.  I have gone

3    over the orders and didn't find any reason to change any part

4    of them.

5              Okay.  I have signed both orders and we will put them

6    on ECF.

7              Anything further?

8              MR. SOMMERS:  Nothing from the lead plaintiff, your

9    Honor.  Thank you very much.

10             MR. WERTHEIMER:  Nothing from Orthofix, your Honor,

11   but thank you very much for your overseeing the case.

12             THE COURT:  Okay.  Good afternoon, all.

13                            o0o

14

15

16

17

18

19

20

21

22

23

24

25